IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO.  LKG-22-007 |
| | * | |
| MARILYN MOSBY, | * | |
| | * | |
| Defendant. | * | |
| ******* | | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
### TO ADMIT OUT-OF-COURT STATEMENTS

The defendant's proposed admissions are rife with hearsay and should not be admitted. Many of the statements, made long after the facts in question, are also not relevant to what the defendant knew at the time she applied for the mortgages, and thus fail Rule 803(3)'s contemporaneity requirement. What's more, at the time all these statements were made, the defendant and her associates had ample motive to fabricate due to the multiple then-ongoing publicly reported investigations by various bodies into the defendant. The defendant and Mr. Mosby may testify to their own knowledge, but they cannot evade the stand by hiding behind hearsay evidence.

1. **Every Statement the Defendant Seeks to Admit Happened Long After the Facts at Issue in the Case, and After Public Reports About a Federal Tax Investigation**

The defendant is charged with lying about the existence of tax debt and lien in July-September 2020 (the Kissimmee property) and in January-mid February 2021. The out-of-court statements the defendant seeks to admit range from March 22, 2021 (the defendant's text messages to G.B., ECF 350, at 2) all the way to September 2021. In other words, the defendant seeks to introduce these statements made six months to a *year* after the Kissimmee purchase to purport to show her state of mind at the time of that purchase.  And statements made one month to seven

months after the Long Boat Key purchase to show her state of mind at the time of that purchase. These statements not only fail the contemporaneity test of Rule 803(3), they also all come *after* the Baltimore Sun first published information on March 19, 2021 indicating that the defendant and her husband were under federal investigation related to their taxes, which gave the defendant ample reason and opportunity to lie and concoct a false story, which is exactly what these statements sought to do. *See* Justin Fenton & Tim Prudente, *Federal Grand Jury Investigating Baltimore Officials Nick, Marilyn Mosby; Churches, Campaign Staff Subpoenaed*, Baltimore Sun, March 19, 2021, available at https://www.baltimoresun.com/2021/03/19/federal-grand-jury-investigating-baltimore-officials-nick-marilyn-mosby-churches-campaign-staff-subpoenaed/.

Rule 803(3), on which the defendant relies heavily, has a "contemporaneity requirement" to insure a statements reliability. The statement sought to be introduced must be made at the same time as the instance on which the defendant is opining so that the defendant "must not have had time to reflect and possibly fabricate or misrepresent." *United States v. Secor*, 73 Fed. Appx. 554, 556 (4th Cir. 2003); *see also United States v. Reyes*, 239 F.3d 722 (5th Cir. 2001). That requirement clearly states that for a statement to admissible "it must have been contemporaneous with the state of mind *sought to be proved*." *Secor*, 73 Fed. Appx. at 566. All these statements thus—at best—prove the defendant and Mr. Mosby's state of mind months (and almost a year) *after* the events in question, along there is insufficient evidence even to suggest this. But state of mind long after a crime is complete is wholly irrelevant to trial, as this Court correctly recognized when it excluded similar testimony in the perjury trial about the self-serving steps the defendant took to attempt to make Mahogany Elite appear to be a viable business in the months and years *after* her indictment. The issue at trial is what the defendant thought when she filled out the forms

in 2020 and early 2021, not what she may have thought months or even a year later. Thus, even if admissible, the evidence ought to be excluded as irrelevant.

Moreover, there is a second independent reason that the statements fail under Rule 803(3): there must be "*no suspicious circumstances* suggesting a motive for the declarant to fabricate or mispresent his or her thought." *United States v. Srivastava*, 411 Fed. Appx 671, 485 (4th Cir. 2011) (emphasis added); *accord United States v. Neely*, 980 F.2d 1074, 1083 (7th Cir. 1993); *United States v. Faust*, 850 F.2d 575, 585 (9th Cir. 1988). These circumstances are just the opposite of "no suspicious circumstances." The defendant and her husband began to make these self-serving statements after public reports that they were under federal tax investigation, and after stories directly calling into question their conduct. In fact, the first set of text messages the defendant seeks to introduce took place just *two days* after the March 19, 2021 story broke in the Baltimore Sun regarding an ongoing tax investigation, and was sent in direct response to the Baltimore Brew's article regarding the Second Home Rider. *See* Justin Fenton & Tim Prudente, *Federal Grand Jury Investigating Baltimore Officials Nick, Marilyn Mosby; Churches, Campaign Staff Subpoenaed*, Baltimore Sun, March 19, 2021, available at https://www.baltimoresun.com/2021/03/19/federal-grand-jury-investigating-baltimore-officials-nick-marilyn-mosby-churches-campaign-staff-subpoenaed/. The other statements continued as the political and legal liabilities for the defendant mounted, and so they had every reason to fabricate and dissemble.

Given the clear incentive for the defendant to lie, the Court should not allow these after-the-fact attempts to create a favorable record into evidence. But if the Court does so, the Government should be allowed to present evidence regarding the myriad ongoing investigations the defendants were under at the time that provided an incentive to fabricate, and the many political

3

problems the defendants may have also sought to address via these remarks that were so attenuated in time from the time-period charged in the indictment.

The Government now turns to the specific infirmities in each set of remarks in addition to those systemic issues noted above.

**2. The Defendant's Self-Serving March 2021 Text Message Should Not Be Admitted.**

On March 22, 2021—six months *after* the closing on the Kissimmee property—the defendant sent a tweet to her mortgage broker. That tweet contained a picture of the interior of the Kissimmee home and link to a lengthy Baltimore Brew Article.[1] The tweet read: "In mortgage documents @MarilynMosbyEsq said she'd use Florida property as second home, then made it a rental <link> [By signing a rider that she would not rent out the property, she got a roughly $50,000 break on the down payment and will pay a lower interest rate]."

The article contained in the link and embedded photographs ran over 2,000 words. The article discussed the rental prices for the home, an "eight-bedroom, three-master-suite-villa;" noted that the defendant had "secured . . . a landlord license, doing business as 'Mosby Rental'"; contained the full text of the Second Home Rider, along with a picture of the pool and lanai; stated that "Wire fraud, mail fraud and bank fraud statutes have been used in cases where an individual is found making false statements in a mortgage application or otherwise attempting to defraud a lender"; contained tweets sent from the defendant's twitter account attributed to her then-attorney, which stated, in part "This should not be news, nor does it merit a federal investigation. So what?!"; and pictured the Long Boat Key home and discussed the sale price. The article also noted that:

---

[1] The full text of the article may be found here: https://www.baltimorebrew.com/2021/03/22/marilyn-mosby-said-in-mortgage-documents-shed-use-florida-property-as-second-home-then-she-made-it-a-rental/ (last accessed Dec. 21, 2023).

> [T]he *Baltimore Sun* was the first to report last Friday that Mosby and her husband, Baltimore City Council President Nick Mosby, were under a criminal investigation by the U.S. attorney's office.
>
> While the exact contours of the investigation are unknown, grand jury subpoenas were issued for the couple's tax records, their side businesses (Marilyn's Mahogany Elite Enterprises and Nick's Monumental Squared LLC), and worksheets and accounting records for the "Friends of Marilyn Mosby" campaign committee.

The articular went on to note that "a report recently issued by Baltimore's inspector general raised issues involving Marilyn Mosby's use of Mahogany Elite as a way to take business deductions on federal taxes and to pay for at least one airplane ticket to Florida for her husband." It went on to discuss reports that the defendant and her husband "owed the IRS $45,000."

The defendant first moves to admit the four words "Is this even accurate" as evidence. As discussed above the comment, six months after the closing when the defendant was in the midst of multiple ongoing investigations that gave her good reason to attempt to feign ignorance of her crimes, is not relevant to her state of mind in September 2020 or February 2021 when she signed the documents. Second, the defendant argues that her question does not qualify as a statement because it is not an "assertion." ECF 350, at 3. But her "question" is not even a question—it lacks a question mark. Instead, it is better seen as an implied assertion intended to elicit from the mortgage broker exactly what he responded: that the accusation (which is the core of a charge in this case) is untrue. "Although some questions and inquiries may constitute non-hearsay—where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the hearsay definition." *United States v. Torres*, 794 F.3d 1053, 1056 (9th Cir. 2015). This statement, lacking a question mark and calling for precisely the answer the defendant received—that the Brew article was not accurate, was exactly what she sought to imply. The defendant didn't ask "is this true?" or "I had no idea!" She wrote: "is this *even* true" with no punctuation, an implied assertion that the link above was false. The

5

defendant argues that her mortgage broker would not have "promised to investigate" if he had thought otherwise. But that is not even true—his "investigation" involved immediately telling the defendant that "I believe you sign something saying you intend to occupy the property. Florida has land trusts. They hide ownership too." Why—if he was genuinely interested in determining the facts, would his first impulse have been to explain how the defendant could "hide ownership" of properties?

To make perfectly clear the intent of her original message—to disparage the Brew article's factual statements—the defendant then sent a follow up tweet to her mortgage broker. This tweet stated that her second home rider "says she can't rent property but DOES allow short term rentals, which is how it's currently available. There's no indication that she did anything wrong with this purchase or that it is among the things under investigation." ECF 350, Ex A at 2. That subsequent message appears to show the purpose of "is this even true"—an implied assertion that she had no liability, criminal or otherwise, for her actions (potential liabilities the Brew article raised). If so, that is the truth of the matter she seeks to assert—that she is innocent of any wrongdoing. While the defendant may take the stand to make that statement herself, she cannot use self-serving hearsay to do it for her. A tweet proclaiming innocence is not admissible as "state of mind" evidence. Twelve hours later, the mortgage broker responded with exactly the "analysis" she sought: telling her she had "not relinquished control of the place." ECF 350, Ex. A at 3.

But even more problematic, "is this even true" alone does not explain anything to the jury at all. First, the jury would have to see the link the defendant sent. And the article and tweet are rife with hearsay. Moreover, it's not clear what exactly the defendant was even referencing in the article by "this"—perhaps she was talking about the article's note that she was exposed to potential criminal liability? Or the tax lien on her home? Or the contract with Executive Villas? Or her use

6

of Mahogany Elite to deduct a flight for her husband to Florida? Even the tweet itself contains multiple ambiguous statements she could have been referring to: did she mean that she had signed a document that "she'd use the Florida property as a 2nd home, then made it a rental"? Or was she referring to the fact that "by signing a rider that she would not rent out the property, she got a roughly $50,000 break on the downpayment and will pay a lower interest fee?" The record is completely unclear. And so is the statement. It is thus unreliable, unhelpful, and would be extremely confusing to the jury.

The defendant also seeks to admit the follow up messages, which she claims are "necessary context." But they are filled with even more troubling hearsay—statements by the mortgage agent describing his understanding six months later in the midst of investigations about the agreement the defendant—a lawyer—had signed. These statements do not "put into context" the defendant's question. ECF 350, at 7. They provide further self-serving statements by the mortgage broker six months after the closing. And they provide no indication of what was in the defendant's head when she sent the message—only what was in the mortgage broker's head when he received it. The same is true of the additional tweet the defendant sent regarding there being "no indication that she did anything wrong." All of these statements are textbook hearsay and should be excluded. They provide no context about what the defendant was thinking, but merely about what the mortgage broker thought the defendant wanted to hear.

### 3. J'H's Conversations with Nick Mosby Are Hearsay and Should Be Excluded

Rather than call a witness, Mr. Mosby, to testify, the defendant instead seeks to put in the out-of-court statement the defendant Mr. Mosby is claimed to have made almost a year after the Kissimmee closing, stating that "It's my obligation. I want to take care of it." ECF 350, at 7. This too is of at best virtually no probative value, since it is *almost a year* after the first events in

7

question in the closing on the Kissimmee property. And this statement was made in the context of an ongoing federal tax investigation of which the defendant and Mr. Mosby were acutely aware and regarding which representatives for the defendant and Mr. Mosby had made numerous public statements.

While the defendant argues that this is a statement of future intent--and that might arguable be true for "I *want* to take care of it," (emphasis added), the statement "it's my obligation" is manifestly not a statement of future intent. It's a statement of what is, and an unclear statement at that. And the defendant seeks to put this highly unreliable statement in to prove the truth of the matter she asserts is what the statement says: that the tax obligation belongs solely to Mr. Mosby. However, the tax debt did not belong solely to Mr. Mosby; it was a shared tax debt. There is a world of difference between a household obligation of doing the taxes and the legal responsibility for an IRS debt arising from a decade's worth of jointly filed tax returns. The attempt to subtly paper over this distinction shows even more why this statement is troubling: it confuses an important element of the crime through an incomplete, unhelpful, and unreliable statement devoid of context.

**4. J.H.'s Conversations with the Defendant are Hearsay and Should Be Excluded**

Like the statements of Mr. Mosby, the defendant's statements seven months after the Kissimmee closing that the lien was "Nick's issue" are clearly being admitted to prove the truth of the matter asserted: that the tax lien was solely "Nick's issue." The defendant attempts to get around this simple and straightforward understanding of the evidence by claiming that she will offer it to "show she *believed* Nick was responsible for taking care of the lien." ECF 350, at 8. Never mind what she believed seven months later (and had good reason to fabricate at that time) is wholly irrelevant—simply casting something as "state of mind" does not allow the defendant to

enter in scads of post-hoc hearsay in any case where the defendant's state of mind is at issue. Moreover, the statement suffers from the same problem as the statement above: a self-serving statement regarding responsibility for "taking care" of a lien at an undetermined time has no relevance to whether the defendant knew she owed as tax debt at the time she filled out her loan applications. The statement would only serve to distract and confuse the jury.

### 5. The Defendant's Statements to Her Mortgage Broker Are Hearsay

The defendant wants to introduce evidence that the defendant's mortgage broker claims that when the defendant became aware of the lien, she "called him and was livid because it was news to her." ECF 350, at 10.  First, this suffers from the same infirmities as the other statements—and it is not even clear when this conversation took place.  Surely, it did not take place when the mortgage documents were signed in September 2020 for the Kissimmee property—or before the February 2021 Long Boar Key closing, or one presumes an ethical mortgage broker would have seen the documents fixed.  More importantly, there is no indication that the conversation took place close in time to the defendant finding out about the tax lien. Rather, the witness stated in an interview that the defendant called him and was livid because she claimed that the lien was news to her, and she thought her husband had taken care of it. That is hardly a contemporary present sense impression—someone can be angry well after the event took place.  It is a free-floating conversation being introduced to prove the truth of the matter asserted.

There is similarly insufficient evidence to show the statement qualifies as an "excited utterance." There is no indication for how the mortgage broker knew this was the first time the defendant heard about the lien.  Or whether she was telling the truth (as opposed to the proverbial person who witnesses a car crash).  There is thus no indication that the defendant was actually an "excited declarant" who did not have "time to reflect on events to fabricate."  Lastly, the

9

defendant's demeanor on a call well after the tax lien became a public issue is of no moment, because the defendant had ample reason to fabricate.

## CONCLUSION

The Defendant may take the stand and testify that she did not know about the tax lien and debt. She may call Mr. Mosby to testify that he lied to her about having settled the debt by the time she filed her false applications. But she cannot avoid calling witnesses by admitting hearsay evidence.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Sean R. Delaney
Aaron S.J. Zelinsky
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this day, a copy of the foregoing motion was electronically filed via CM/ECF which provides notice to counsel of record.

_____/s/_____
Aaron S.J. Zelinsky
Assistant United States Attorney