**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**MARILYN J. MOSBY,**<br><br>    **Defendant.** | **Criminal No. LKG-22-7** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

As proven at two separate trials, Defendant Marilyn Mosby ("Ms. Mosby" or the "Defendant") now stands before this Court having been convicted of perjury and mortgage fraud. Exploiting a crisis for her own benefit, Ms. Mosby abused a law meant for Americans in need of emergency financial assistance–and lied repeatedly to do it.  Ms. Mosby was charged and convicted because she chose to repeatedly break the law, not because of her politics or policies. Two separate juries of her peers in the venue of her choosing rejected her self-serving claims and found her guilty.  For the reasons discussed below, the Government requests the Court sentence the Defendant to 20 months incarceration followed by a period of supervised release, a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines").  This sentence appropriately reflects the seriousness of Defendant's conduct and is not greater than necessary to satisfy the purposes of sentencing.  18 U.S.C. § 3553(a).  By imposing a sentence of 20 months incarceration, the Court will make clear that those who break the law, including those in positions of public trust, will be held accountable.

## I.      Procedural Background

On January 13, 2022, the Defendant was charged in a four-count Indictment with Counts One and Three, Perjury, in violation of 18 U.S.C. § 1621; and Counts Two and Four, False Statement on a Loan Application, in violation of 18 U.S.C. § 1014.  *See* Presentence Report ("PSR") ¶ 1.  On March 10, 2022, a Superseding Indictment was then filed and on November 9, 2023, and February 7, 2023, respectively, the Defendant was found guilty in two separate jury trials of Counts One, Three and Four of the Superseding Indictment.  *Id.* at ¶¶ 2-3.

The Defendant's three convictions represent three separate crimes, each committed several months apart.  Her first perjury occurred on May 26, 2020, in order to withdraw $40,000 from a Baltimore City Deferred Compensation Plan.  *Id.* at ¶ 10.  She then used those funds in September 2020 for the downpayment and closing costs on a vacation home in Kissimmee, Florida.  *Id.* at ¶ 22.  Her second perjury occurred on December 29, 2020, in order to withdraw an additional $50,000 from a Baltimore City Deferred Compensation Plan.  *Id.* at ¶ 23.  She then used those funds in February 2021 for the downpayment and closing costs on a vacation home in Long Boat Key, Florida.  *Id.* at ¶ 26.  That same month, she submitted the fraudulent gift letter, falsely stating that her husband was to give her a gift of $5,000.  *Id.* at ¶ 28.  In fact, the $5,000 actually represented the Defendant's own funds that she tricked the lender into double counting.  These are independent acts, committed months apart, and each demonstrate independent decisions by Ms. Mosby.

## II.      United States Sentencing Guidelines Calculations

The Government agrees with the Guidelines as calculated by the United States Probation Office in the PSR.  PSR ¶¶ 35-60.  Those Guidelines calculations are as follows:

<u>Count One</u>

The appropriate section under the Guidelines for perjury, in violation of 18 U.S.C. § 1621, is § 2J1.3.  Pursuant to § 2J1.3, the Base Offense Level for Count One is 14.

<u>Count Three</u>

The appropriate section under the Guidelines for perjury, in violation of 18 U.S.C. § 1621, is § 2J1.3.  Pursuant to § 2J1.3, the Base Offense Level for Count One is 14.

<u>Count Four</u>

The appropriate section under the Guidelines for making a false statement on a loan application is § 2B1.1.  Pursuant to U.S.S.G. § 2B1.1(a)(1), the Base Offense Level is 7, because the Defendant was convicted of an offense referenced to that guideline and the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.

In light of the Defendant's testimony at trial, the Government agrees with the PSR that the jury's verdict as to Count Four represents a finding by the jury that she testified falsely.  Pursuant to § 3C1.1, the Government submits that the Defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution of the instant offense of conviction," and the Defendant's offense level should be increased by two levels.  The enhancement applies not simply because the Defendant testified at trial and was nonetheless convicted.  Rather, the Defendant, through her trial testimony, presented the jury with a false narrative that the jury, through its conviction on Count Four, expressly rejected.

On direct examination, the Defendant testified:

> I mean, I looked at the sample gift letter and then I asked Nick to fill it out I told him the situation.  And he told me that he believed that he would have the $5,000 by the time of closing.  Not necessarily confident that he would have the $5,000 at closing, when I got paid I wired $5,000 to his [account] just in case he didn't have the $5,000 I didn't want to chance it.

January 31, 2024 Transcript (Tr.) at 76, ¶¶ 10-16.  Her direct testimony continued:

> **Q.**  Did you think you were doing anything wrong with the gift letter?
>
> **A.**  I absolutely did not think I was doing anything wrong in wiring him $5,000 when he said he was going to have it just in case he didn't.

*Id.* at 76, ¶¶ 20-24.

On cross examination, the following exchange occurred:

> **Q.**  Ms. Mosby, this wasn't a gift from your husband to you.  This was money you had given him, correct?
>
> **A.**  Is that your testimony, no, that is not correct.

February 1, 2024 Tr. at 29, ¶¶ 6-8.  The Defendant then further stated, "I gave him $5,000 in case he did not have it as he stated he would have it in his account.  He did."  *Id.* at 30, ¶¶ 20-21.

Through her testimony, the Defendant made clear that, at the time she filled out the gift letter on February 10, 2021, she intended to receive a gift of $5,000 from her husband, and that she only sent him $5,000 "just in case" he did not have the funds.  The evidence proves that the Defendant's narrative was false.  The Defendant wired $5,000 to her husband on February 17, 2021, seven days after the submission of the letter and two days before closing.  These funds were transferred by her husband to his savings account and back again before he sent them to the escrow agent on the day of closing.  If the funds sent by the Defendant to her husband were simply a precautionary loan made unnecessary because he actually had the funds in his account on the date of closing, then her husband would have wired $5,000 to the escrow agent, and also sent $5,000

4

back to the Defendant.  The evidence shows this did not occur.  Moreover, the jury expressly rejected the Defendant's false narrative through their conviction of the Defendant on Count Four. In convicting on Count Four, the jury found that, by submitting the gift letter on December 10, 2020, the Defendant acted knowingly, which means she "acted deliberately, intentionally, and understandingly; that is, that she knew what she was doing, and that she knew the statement was false at the time it was made."  Instruction Number 28, ECF #471, p. 32; *see also* Sand, Siffert, Modern Fed. Jury Instructions, Instruction No. 37:19.  Consequently, the jury made a finding that the Defendant's self-serving testimony as to the gift letter was false testimony made under oath before the Court.  The $5,000 was not a gift, despite the Defendant's false testimony under oath.

The final offense level for Count Four is therefore 9.

<u>Grouping</u>

As an initial matter, the Defendant's conviction for making a false statement on a loan application does not group with her convictions for perjury.  Grouping is analyzed under U.S.S.G. § 3D1.2.  Pursuant to that section, "[a]ll counts involving substantially the same harm shall be grouped together in a single Group."  This is appropriate "[w]hen counts involve the same victim and the same act or transaction . . . [w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan . . . [or] [w]hen the offense level is determined largely on the basis of the total amount of harm or loss . . ." *Id.*

While the perjury and false statement to mortgage lender convictions all involve false statements made by the Defendant, the false statements under Counts One and Three were made to Nationwide, the Baltimore City Deferred Compensation Plan Administrator, to withdraw funds that were the property of the City of Baltimore.  The false statement under Count Four was made

to United Wholesale Mortgage in connection with the Defendant's attempts to get a residential mortgage loan.  For this reason, Count Four does not involve the same victim, the same transaction, or the same harm as Counts One and Three.  Moreover, while § 2B1.1, the applicable guideline for false statements to a mortgage lender, considers loss in calculating the offense level, § 2J1.3, the guideline applicable for perjury, does not.

The Government also agrees with the PSR that Counts One and Three should not group with each other.  Regarding Ms. Mosby's two perjury convictions, U.S.S.G. § 2J1.3(d)(1) provides:

> In the case of counts of perjury or subornation of perjury arising from testimony given, or to be given, in separate proceedings, do not group the counts together under § 3D1.2 (Groups of Closely Related Counts).

Application Note 5 to § 2J1.3 reads:

> "Separate proceedings," as used in subsection (d)(1), includes different proceedings in the same case or matter (e.g., a grand jury proceeding and a trial, or a trial and retrial), and proceedings in separate cases or matters (e.g., separate trials of codefendants), but does not include multiple grand jury proceedings in the same case.

Ms. Mosby's two separate convictions for perjury relate to two separate statements, for two separate purposes, submitted under the penalties for perjury to Nationwide, the Baltimore City Deferred Compensation Plan Administrator.  The statements were made on separately signed and submitted forms and were made seven months apart: the first in May 2020 resulting in a $40,000 payment and the second in December 2020 resulting in a $50,000 payment.

As a result of the above-described facts and law, none of the Defendant's convictions should group.  The grouping rules are set forth in U.S.S.G. § 3D1.4, which discusses the calculation of units.  Pursuant to that section, Count One counts as one unit because it has the highest offense level.  Count Three should count as one additional unit because it is equally serious as Count One.

Count Four should count as one half unit, because it is between 5 to 8 levels less serious.  This results in 2 ½ units, representing a three-level increase.

<u>Adjustment for Zero Point Offenders</u>

In calculating Ms. Mosby's total offense level, the Government agrees with the PSR that that the Defendant qualifies for the adjustment for the newly created two-level reduction under U.S.S.G. § 4C1.1 for a qualification as a "zero-point offender," which took effect on November 1, 2023, and would result in a two-level reduction to the Base Offense Level.  PSR ¶ 59.

The resulting final offense level for the Defendant, considering all of the above factors and analysis, is 15.  PSR ¶ 89.  Given a Criminal History Category I and an Offense Level of 15, the applicable Guidelines range is 18-24 months.  *Id.*

**III.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In addition to determining the Guidelines range, the Court must also weigh the sentencing factors set forth in 18 U.S.C. § 3553(a) and comply with *United States v. Booker*, 543 U.S. 220 (2005), and its progeny, in order to determine the Defendant's sentence.  A sentencing court may not "presume that a sentence within the applicable Guidelines range is reasonable," but must consider the § 3553(a) factors.  *Nelson v. United States*, 555 U.S. 350, 352 (2009).  Nonetheless, the Guidelines and the post-*Booker* sentencing regime sensibly "steer district courts to more within-Guideline sentences."  *Peugh v. United States*, 569 U.S. 530, 531 (2013).  That is because "[t]he post *Booker* federal sentencing scheme aims to achieve uniformity by ensuring that sentencing decisions are anchored by the Guidelines and that they remain a meaningful benchmark through the process of appellate review," *Id*. at 541.

Here, a sentence of 20 months' incarceration, which is within the Guidelines range, appropriately considers the nature and circumstances of the offense, reflects the seriousness of the

offense, promotes respect for the law, provides just punishment for the offense, affords adequate general and specific deterrence and is consistent with the United States Sentencing Commission's policy statements on the need for deterrence in white collar crimes, and is no greater than necessary for these purposes.  18 U.S.C. § 3553(a)(1), (2), (5) and (7).  Specifically, the Court should impose the Government's recommended sentence for the following reasons:

### a.   Nature and Circumstances of the Offense

Nothing speaks to the gravity of Ms. Mosby's conduct more than the circumstances in which it occurred: the COVID-19 global pandemic.  Beginning on March 13, 2020, daily life shut down. Schools began closing, court proceedings were postponed, and sporting events were canceled, as Maryland, the United States, and the world faced the spread of COVID-19, an infectious disease caused by the coronavirus SARS-CoV-2.[1]  By March 16, 2020, Governor Larry Hogan ordered the closure of Maryland bars and restaurants.[2]  On March 18, 2020, Baltimore Mayor Jack Young placed Baltimore under a state of emergency,[3] and by March 26, 2020, Maryland had been declared a federal disaster area.[4]  By May 19, 2020, Maryland announced a single-day high of 1,784 new COVID-19 cases.[5]  And by January 1, 2021, 5,727 Marylanders had tragically lost their lives to the virus.[6]

---

[1]   *See*  https://www.baltimoresun.com/2020/03/13/schools-closing-and-events-from-court-trials-to-sports-are-canceled-as-maryland-faces-coronavirus-spread.

[2]   *See*  https://www.baltimoresun.com/2020/03/16/maryland-bars-restaurants-close-under-order-of-gov-hogan-who-expects-coronavirus-case-numbers-to-soar.

[3]      *See*        https://www.baltimoresun.com/2020/03/18/baltimore-mayor-declares-state-of-emergency-announces-5-coronavirus-cases-some-with-clear-community-transmission.

[4]   *See*  https://www.baltimoresun.com/2020/03/26/president-trump-declares-major-disaster-in-maryland-due-to-coronavirus-releasing-funds-after-request-from-gov-larry-hogan.

[5]   *See*   https://www.baltimoresun.com/2020/05/19/maryland-announces-single-day-high-of-1784-new-coronavirus-cases.

[6]   *See*  https://www.cbsnews.com/baltimore/news/remembering-more-than-5000-marylanders-who-died-of-covid-19-in-bleak-2020-and-hope-for-a-better-2021/.

To provide emergency assistance and health care for individuals, families, and businesses affected by COVID-19, Congress enacted the "Coronavirus Aid, Relief, and Economic Security Act" or the "CARES Act."[7]  Set against the backdrop of a global pandemic wreaking financial chaos for some, Congress sought to help those struggling by allowing withdrawals from certain retirement plans that otherwise would have been impossible, but only in certain situations enumerated by law.  As a result of the CARES Act, the Defendant's 457(b) plan allowed for such withdrawals, but only if she submitted a sworn statement that she qualified for the withdrawal.  The administrator of the Defendant's 457(b) plan relied on the truth of the Defendant's sworn statement in releasing the funds.  The jury's verdict has clearly established that the Defendant twice committed perjury by lying on two sworn statements.  The seriousness of the Defendant's conduct is therefore reflected in the fact that she abused an emergency law meant to help those in need even though she herself did not suffer any financial hardship—instead, her motivation was greed.

Set against this once global pandemic, with so many suffering physical and financial harm, Ms. Mosby remained healthy and employed, receiving her full gross salary of $247,955.58, in addition to her husband's $130,000 plus yearly salary.  Therefore, her total family income exceeded $375,000.  The Defendant's household income vastly exceeded the 2022 United States Census median household income of $74,580.  *See* Gloria Guzman and Melissa Kollar, U.S. Census Bureau, Current Population Report No. P60-279, Income in the United States: 2022 (September 12, 2023).

---

[7]   *See*   https://www.congress.gov/bill/116th-congress/senate-bill/3548/text.

With a healthy government-protected income stream and an economy in turmoil, the Defendant saw a financial opportunity, texting to a realtor on April 23, 2020 the following:



Ms. Mosby recognized a depressed and uncertain real estate market—a housing market down because others *actually were suffering adverse financial consequences* from COVID-19, and then abused a lifeline provided for Americans in need for her own substantial profit.  She broke the law, while others suffered under the weight of the pandemic.

Significantly, the Defendant also recognized a substantial gain as a result of her perjury, and depending on the Court's decision as to forfeiture, may gain further.  Because she committed perjury to withdraw the funds needed for the downpayment and closing costs, she was able to purchase the Kissimmee property at a purchase price of $545,000 in September 2020.  A little over one year later, after financial markets stabilized and rebounded from the turbulence of 2020, the Defendant was able to sell this property for $696,000—an increase of approximately $150,000. The Defendant received this benefit as a direct result of her May 2020 perjury.[8]

---

[8]   It is relevant to note that this perjury conviction does not have an associated forfeiture provision that takes into account this $150,000 profit.  As such, Ms. Mosby benefited from a windfall of the better real estate market and her perjury, and the Government is without the legal recourse to obtain forfeiture of these funds.

In addition, as a direct result of her December 2020 perjury, the Defendant withdrew $50,000 that was, prior to her perjury, solely the property of the City of Baltimore. She used those funds to make a downpayment to purchase the Long Boat Key property at the price of $476,000. That property has increased in value since the date of purchase. Numerous real estate valuation services highlight this appreciation. For example, Redfin estimates the property to have a current value of $886,084.[9] Zillow estimates the property to have a current value of $779,300.[10] Were the Defendant to sell this property obtained using the proceeds of her perjury, she stands to make a windfall profit of between $300,000 and $400,000.

The Defendant has repeatedly pushed the false narrative that the funds she withdrew from the 457(b) plan were her money. As the Court properly instructed the jury in the Defendant's first trial, "Until the time when the participant is eligible to withdraw the money, the money is the sole property of the employer. *The funds held in trust were not her money*." November 8, 2023 Rough Tr. at 138 (emphasis added). Therefore, the funds withdrawn by the Defendant were not hers to access, much less hers to use to invest in expensive Florida vacation property by taking advantage of the financial chaos caused by a global pandemic. Those funds were "solely" the property of her employer, the City of Baltimore, whose citizens she served.

Of course, the Defendant's perjurious statements in 2020 were not her only crimes: the jury in the second trial also found that she lied in February 2021 to the lender who gave her money to buy the Long Boat Key property. The evidence at trial proved that the lie was material, as Ms. Mosby lacked the necessary cash to close on her home loan for the purchase of the Longboat Key condominium and without the $5,000 gift letter (and subsequent $5,000 "gift" from her husband

---

9   *See*   https://www.redfin.com/FL/Longboat-Key/2934-Gulf-of-Mexico-Dr-34228/unit-2934/home/47614266. Last accessed May 9, 2024.
10   *See*   https://www.zillow.com/homes/2934-Gulf-Of-Mexico-Dr-Longboat-Key,-FL-34228_rb/47465453_zpid/. Last accessed May 9, 2024.

at closing), she would not have been "cleared to close" on the Longboat Key condo and would not have received the loan.

In other words, the evidence and the jury's verdict make clear that the loan could not go forward without the fraudulent gift letter. Once the gift letter was received, the mortgage company cleared the loan and the Longboat Key property closing took place. Ms. Mosby obtained a $428,400 loan for that property. Without the gift letter, the loan would never have been provided and Ms. Mosby would not have obtained the property. No gift letter, no loan. While forfeiture can disgorge the Defendant of the proceeds of her fraud, this would merely put her back in the place she was prior to her criminal conduct. Without a significant sentence of imprisonment, forfeiture alone would not adequately reflect the seriousness of the Defendant's crimes.

### b. The History and Characteristics of the Defendant

At the time of her crimes, Ms. Mosby was an attorney and Baltimore's highest elected prosecutor. PSR ¶ 84. Both facts make her crimes much more egregious. She also previously worked in the private sector as a counsel for Liberty Mutual. *Id.* ¶ 85. Given her education and prior legal and business experience, she had a path beyond her job as Baltimore City State's Attorney to take care of her and her family's financial wellbeing. She instead chose to rely on fraud to enrich herself. In addition, as the evidence proved during both of her trials, Ms. Mosby's crimes do not represent an accident, a one-time mistake, or a momentary lapse in judgment. Instead, they instead reflect a consistent pattern of lies.

As Baltimore City's chief prosecutor, Ms. Mosby was in a position of public trust. One example of that trust was that Ms. Mosby was responsible for determining which Baltimore City police officers would be allowed by the City State's Attorney's Office to be able to testify under oath in criminal cases that were brought under her authority. In fact, her office kept and published

a list of officers whose words could not be trusted.[11]   The protocols for the creation of the list indicate that an officer generally qualified for inclusion if: "The officer has been convicted of perjury, false statement, crimen falsi (any crime involving deceitfulness, untruthfulness, falsification, or related element bearing on propensity to testify truthfully)."[12]   The creation of this list appeared designed to instill confidence in citizens that her former office would sponsor the truth.   It also demonstrates that perjury and false statement convictions are significant crimes. While Ms. Mosby decided whether others should be trusted, the verdicts at her two trials instead establish that *she* could not be trusted to tell the truth.

While the Defendant lacks a criminal history, she is no typical first-time offender.   First, she was convicted of not one, not two, but three separate crimes, committed over the course of approximately eight months.   Second, the evidence at trial demonstrated clearly that the Defendant created a fictitious business that conducted no business at all and was instead utilized to falsely reduce her taxes.   Third, the Defendant has the added benefit of being categorized as zero-point offender.   But the Government would be remiss in failing to point out that she does not stand before this Court as someone who made one simple mistake and is now facing sentencing.   Her actions demonstrate a consistent pattern of dishonesty and disrespect for telling the truth.

In addition, the law calls for the Court to consider the entirety of the Defendant's history and characteristics, not just those she may choose to highlight in mitigation.   For that reason, the Government asks the Court to take into consideration the Defendant's Mahogany Elite entity.   The evidence at trial demonstrated that the Defendant's so-called travel business was nothing more

---

[11]   *See*   https://www.cbsnews.com/baltimore/news/mosby-publishes-do-not-call-list-of-bpd-officers-who-lack-credibility-to-testify/.
[12]   *See*
https://www.stattorney.org/images/data/BCSAO_Protocols.pdf?utm_medium=email&utm_source=govdelivery.

than a tax dodge.  The jury's verdict demonstrates that the Defendant lied when she stated Mahogany Elite suffered adverse financial consequences as a result of the Coronavirus.

At trial, Ms. Mosby's counsel argued that Ms. Mosby suffered the closing or reduction of hours of a business she owned or operated, specifically a business for professional women of color to go on retreats to various destinations.  *See* November 6, 2023 Rough Tr. at 23, ¶¶ 13-17.  The Defendant called Shelonda Stokes to testify regarding a trip that she took to Jamaica during which Ms. Mosby allegedly got the idea for the business.  According to documents filed with the State of Maryland, Mahogany Elite purported to "Offer traveling hospitality services."

Prior statements by Ms. Mosby and her agents showed that Mahogany Elite was not an operable business and was not created for professional women of color to go on retreats.  Most importantly, Mahogany Elite could not have been the basis for the adverse financial consequences required for the retirement withdrawal.  In a July 15, 2020, email, Ms. Mosby edited and approved an email sent to the Baltimore Brew in response to questions about Mahogany Elite.  In response to the question "what was/is the purpose of setting up Mahogany Elite Enterprises LLC?" the response was:

> The idea was to set up a travel company to help underserved black families who don't usually have the opportunity to travel outside of urban cities, so they can vacation at various destinations throughout the world at discount prices. This is a long-term venture, hence the reason why there are no clients, and she has not received a single cent in revenue. There are no plans to operate the company while she is State's Attorney.

In a July 20, 2020, letter, Ms. Mosby wrote:

> The article mentions companies I created. As I told the Baltimore Brew, the idea was to set up a travel company to help underserved black families who don't usually have the opportunity to travel outside of urban cities, so they can vacation at various destinations throughout the world at

14

> affordable rates . . . I have not taken a single client for these
> companies, nor have I taken in any money. Any insinuation
> to the contrary is false, misleading, and unethical.

An August 19, 2020, letter from Ms. Mosby's attorney referred to Ms. Mosby's businesses as "non-operational."  A January 21, 2021, letter written by Ms. Mosby's Chief Counsel at the City State's Attorney's Office referred to the business as "inoperable."  On February 12, 2021, Ms. Mosby was copied on a letter from her attorney that stated:

> The companies that our client formed in 2019 are not
> operational. That is what she said. As she explained, the
> companies are brand new and are not yet conducting
> business. There were, however, expenses in connection with
> establishing the companies and with other activities before
> they could become operational.

Government's Exhibit 40 in the Defendant's first trial was Ms. Mosby's 2019 U.S. Individual Income Tax Return, prepared by Sharif J. Small, a return preparer at SJS Financial Firm LLC, and filed on June 17, 2020.  Page 20 of this exhibit was a Schedule C, Profit or Loss from Business, for "Mahogany Elite Enterprises LLC."  On this return, the Defendant claimed a $5,000 loss from Mahogany Elite Enterprises, which, in turn, flowed through to the first page of her tax return and reduced the taxes owed by Ms. Mosby.  As a result, Ms. Mosby's return resulted in a $549 refund.  Per the Schedule C for 2019, Mahogany Elite reported $0 in revenue in 2019 and $0 in gross receipts or sales.

Government's Exhibits 42 and 72 were emails from Ms. Mosby to Mr. Small dated May 23, 2020, and August 7, 2020, each containing a spreadsheet of business expenses submitted by Ms. Mosby to Mr. Small to prepare her tax return.  At trial, the government called FBI Forensic Accountant Jenna Bender as a witness.  As part of her testimony, Ms. Bender analyzed the spreadsheet titled "MAHOGANY ELITE 2019 DEDUCTIONS," found in Government's Exhibit 72, discussing it line by line to the jury.  The jury learned through Ms. Bender's testimony and

review of records that the Defendant's spreadsheet did not reflect charges associated with a travel business, with the only exceptions being initial set-up fees and website domain registration charges.  In fact, the jury learned that what the Defendant represented to her return preparer were Mahogany Elite expenses did not bear any relationship to a business.  Instead, many of the expenses on this spreadsheet were personal expenses of Ms. Mosby and her family.

By way of example, the Mahogany Elite 2019 deductions spreadsheet reflected a trip to Florida from July 26, 2019, to August 3, 2019, resulting in a travel deduction of $541.74.  However, the Government introduced Exhibit 45a, which were Spirit Airlines records showing that, rather than a business expense, this was a flight by Ms. Mosby and her two minor daughters from Baltimore to Boston, Massachusetts.  As a second example, Government's Exhibit 72 listed multiple Mahogany Elite deductions the Defendant submitted to her return preparer for a November 8, 2019, to November 11, 2019 trip to Cancun.  The Government introduced Exhibit 56a, which were United Airlines records showing that the trip to Cancun was taken by the Defendant and her husband.  Bank records founds at Government's Exhibit 13a, as well as records found at Government's Exhibit 55, demonstrate that the deductions the Defendant claimed as Mahogany Elite business expenses were instead charges for the Defendant and her husband to take a trip to an exclusive all-inclusive adults' resort in Cancun.

In addition, the Mahogany Elite 2019 Deductions spreadsheets found at Government's Exhibit 72 states that, from December 18 to December 21, 2019, Ms. Mosby incurred a charge of $645.68 for transportation to Florida.  Bank and Nextcar Rental records show that this charge was related to the rental of a GMC Acadia.  Specifically, the rental car record was admitted at trial as Government's Exhibit 47.  The rental agreement showed the renter as "Marilyn Mosby."  However, in the place for "Employer," the record did not list Mahogany Elite.  Instead, the rental agreement

states the employer was "Empowering Minds," and it listed an address different from the Defendant's address.  Government's Exhibit 54 showed that "Empowering Minds" was a company owned by Knicole Taylor, the Defendant's sister-in-law.  In total, the rental documents and bank records demonstrate that the GMC Acadia was driven 2,000 miles on what appears to have been a family road trip, not a Mahogany Elite business expense.  Beyond these and other false claims for deductions, other expenses on the Mahogany Elite 2019 deductions spreadsheet appeared to be expenses that Ms. Mosby incurred related to her job as State's Attorney.

A comparison of the Defendant's bank and travel records to the deductions she submitted to her return preparer, corroborates the Defendant and her agent's prior public statements about Mahogany Elite: that it was an inoperable business that therefore had no expenses.  This was an important piece of evidence supporting the jury's verdict that the Defendant committed perjury when she claimed otherwise.  But beyond this, the Defendant's 2019 tax return—also submitted under oath—contained a false $5,000 deduction based on an inoperable travel business that suffered no losses.

This is relevant at sentencing because it represents yet further acts of dishonesty by the Defendant.  When the Court considers what will no doubt be a long list of accomplishments the Defendant will cite in support of leniency at sentencing, the Court must balance that against the Defendant's repeated history of dishonesty.

### c.  The Need for The Sentence Imposed to Promote Respect for the Law

Every person accused of a crime has the absolute right to vigorously defend themselves against accusations.  However, from the early stages of this matter, to as recently as May 8, 2024, Ms. Mosby has claimed that this prosecution was motivated by race, personal animus and

politics.[13] This was done as an effort to delegitimize the prosecution by lodging false accusations of targeted animus.  She has held press conferences, gone on national television, and even attempted to raise money based upon her misguided claims.  As this Court has made clear, and it bears consideration once again, there is no evidence supporting the Defendant's claims.  In fact, the Court previously made this clear in ruling:

> Defendant's argument that this criminal matter is the result of a selective or vindictive prosecution has been fully and carefully considered by this Court. *See generally* Apr. 14, 2022, Mem. Op. & Order, ECF No. 52.  Defendant raised this argument in her first motion to dismiss the Superseding Indictment, dated March 10, 2022, and the Court denied this motion in its April 14, 2022, Memorandum Opinion and Order. See Def. 1st Mot. to Dismiss, ECF No. 17; Apr. 14, 2022, Mem. Op. & Order at 10-13.  Notably, in the April 14, 2022, Memorandum Opinion and Order, the Court held that Defendant neither showed that the prosecutors in this case acted with personal animus against her, nor that similarly situated individuals of a different race than Defendant's have not been prosecuted by the Department of Justice for similar offenses.  *See* Apr. 14, 2022, Mem. Op. & Order at 12-13. Given these findings, the Court concluded that Defendant's selective and vindictive prosecution claims were unsubstantiated.  *See id.*

*See* ECF 105 at 11.

Through her actions prior to and during trial, and now in the weeks before her sentencing, Ms. Mosby has demonstrated a continued disrespect for the law and the Court—both in her disregard for this Court's ruling and in her continuing attempt to retry her case through the media.[14] As the former lead prosecutor for the City of Baltimore, the Defendant—of all people—knows that such advocacy is misplaced, misguided, and shows a lack of respect for the law.  A sentence

---

[13]  *See, e.g.*,  https://www.msnbc.com/the-reidout/watch/marilyn-mosby-faces-40-years-in-prison-for-withdra wing-funds-from-her-own-baltimore-deferred-compensation-retirement-account-210093125771 (claim by the defendant she was "politically targeted"); https://www.youtube.com/watch?v=6-V3YtH7b5E (May 8, 2024, at 21:40) ("I've been targeted as a result of the policies and my attempts to balance the scales of justice. There's no other reason.").

[14]  Ms. Mosby's insistence that she was somehow targeted is false and as this Court and the juries that considered her claims have made clear, these claims are not supported by the facts or the law.  However, it is relevant to note that combating fraud related to the COVID-19 pandemic is a priority of the Department of Justice and the Department will work to "deter, detect, and disrupt pandemic fraud wherever it occurs."  *See* Press Release, DOJ, Justice Department Announces COVID-19 Fraud Strike Force Teams (Sept. 14, 2022), https://www.justice.gov/opa/pr/justice-department-announces-covid-19-fraud-strike-force-teams.

of 20 months, which represents the middle of the Guidelines range, is therefore appropriate to promote respect for the rule of law.

### d.  The Need to Avoid Unwarranted Sentencing Disparities and Provide Adequate Deterrence to Criminal Conduct

A sentence within the Guidelines range is also necessary to avoid unwarranted sentencing disparities and provide adequate deterrence, particularly given that the Defendant committed multiple crimes and has refused to accept responsibility for them.

The Sentencing Guidelines in this case call for a sentence of between 18-24 months incarceration, and the Government's recommendation of 20 months incarceration falls within that range.  The Guidelines reflect the consensus that those convicted of economic crimes should not be able to avoid incarceration or be punished less severely because of their status or the nature of their financial crimes.  In fact, the legislative history of the Sentencing Record Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished.  *See* S. Rep. No. 98-22, at 77 (1983) ("[S]ome major offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses.").  Ms. Mosby's crimes are serious and warrant commensurate punishment.

In addition, Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  To assist the Court in determining Ms. Mosby's sentence, the Court should consider that of another former Baltimore City public official, Police Commissioner Darryl De Sousa ("defendant De Sousa").  Defendant De Sousa was prosecuted for three misdemeanor personal tax violations and a total tax loss of approximately $67,000.  Defendant De Sousa accepted responsibility for his crimes and pleaded guilty without trial or even motions practice.  His

19

guidelines range—10 to 15 months' incarceration—was lower than the guidelines range applicable to Ms. Mosby and to the Government's recommended sentence for Ms. Mosby.  At sentencing, defendant De Sousa sought a sentence of probation or home confinement, citing the collateral consequences of the offense, as well as his low risk of recidivism, his full payment of restitution, and his considerable contributions to his community.  Defendant De Sousa argued that he had already suffered "the loss of his entire career, at its pinnacle, the public dishonor, and . . . serious economic loss."  *See* Criminal No. SAG-18-276, Document 24.

The Government asked the court to sentence defendant De Sousa to 12 months of incarceration.  United States District Judge Catherine Blake instead imposed a sentence of 10 months, along with 100 hours of community service, and one year of supervised release. In imposing the 10-month term of imprisonment, Judge Blake told defendant De Sousa, "[t]his is a sad day for you. It's also a sad day for our city . . . This city needs a police force it can trust."[15]

In some ways, Ms. Mosby's conduct is like defendant De Sousa's: hers are white-collar offenses resulting in personal benefit not tied to the Defendant's employment.  However, while the core harm in both Ms. Mosby and defendant De Sousa's crimes undermines public trust, the crimes of Ms. Mosby also include that she took advantage of the circumstances surrounding the COVID-19 pandemic.  In addition, Ms. Mosby's response to her charges—particularly her actions after conviction detailed above—were vastly different than those of defendant De Sousa, who accepted responsibility and expressed remorse for his conduct.  The Defendant has to date expressed no remorse or contrition.  She has instead done the opposite, and consistently sought a public forum to attempt to delegitimize the prosecution against her.  Accordingly, a sentence of 20 months incarceration is appropriate and not disparate to others similarly situated.

---

[15] *See*  https://digitaledition.baltimoresun.com/tribune/article_popover.aspx?guid=a258c49e-d236-4cd3-b6fc-0c470afbeda5.

Moreover, a Guidelines sentence of 20 months' incarceration would provide a necessary message of general deterrence.  Here, the Government submits that the Defendant's actions warrant significant consequences, both due to the seriousness of the offenses and as a general deterrent to send a message to the broader public that taking advantage of a national emergency to enrich oneself through lies will result in serious consequences.  "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (international quotation marks and citation omitted).

Furthermore, a Guidelines sentence can carry an "enhanced value as a means of general deterrence" whose perpetrator "often calculate the financial gain and risk of loss." *United States v. Slavin*, 2022 WL 576016, at *2 (9th Cir. 2022) (quoting *Martin*, 455 F.3d at 1240); *see also* S. REP. 98-225 at 86 ("Major white-collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").  Here, the Government's proposed sentence would help deter other individuals inclined to commit fraud, like the Defendant, who believe they can take advantage during a time of crisis, particularly when done for their personal benefit.

Finally, there is also a need for specific deterrence.  Ms. Mosby's convictions appear to have in no way caused her to believe that she did anything wrong.  In fact, it appears from her continued public comments the Defendant believes that she has been targeted for her crimes, and that she does not accept responsibility for her actions.  If she believes she did no wrong, there is every reason to believe she will do wrong again.  As such a significant sentence of incarceration is warranted.

**IV.       Conclusion**

Application of the factors outlined in 18 U.S.C. § 3553(a) supports a sentence for Defendant Marilyn Mosby of 20 months incarceration,[16] followed by a three-year term supervised release for Counts One and Three, and a five-year term supervised release for Count Four, to run concurrently, which is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

Respectfully submitted,

EREK L. BARRON
UNITED STATES ATTORNEY

By:  _____
        Sean R. Delaney
        Aaron S.J. Zelinsky
        Assistant United States Attorneys

---

[16]   The Government requests that whatever sentence is imposed, the Court impose the sentence concurrently on each count, just as Judge Blake did in *United States v. De Sousa*. *See* SAG-18-276.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this filing was served on the Defendant via ECF electronic filing.

_____
Sean R. Delaney
Assistant United States Attorney